**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KATERYNA PANOVA, individually, and SLAVA RIVKIN, individually, Ed.R. (a minor child), by and through his Guardian ad Litem, Ev.R. (a minor child), by and through her Guardian ad Litem,<br><br>*Plaintiffs,*<br><br>v.<br><br>PALISADES INTERSTATE PARKWAY POLICE DEPARTMENT, COREY PATULLO, THOMAS M. SHINE, JEFFREY M. KIMBRO, CARE PLUS NJ, INC., LISA SAUNDERS, PHILLIP CRADDOCK, JOHN and JANE DOE(s) 1-10 (fictitious persons and/or entities yet to be identified),<br><br>*Defendants.* | Civil No. 21-cv-226 (KSH) (CLW)<br><br><br><br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

**I.     Introduction**

      This civil rights action is brought by plaintiffs Kateryna Panova, along with her husband, Slava Rivkin, individually and as guardians ad litem for their two minor children, Ev.R. (age 3) and Ed.R. (age 4) (together with Panova and Rivkin, "plaintiffs").[1]  Their lawsuit arises from an April 2020 incident at the Palisades Interstate Park involving Panova, her children, and individual defendant Phillip Craddock, who encountered Panova and called the police on her. For their roles in the incident and its aftermath, plaintiffs also sue the Palisades Interstate

---

[1] The complaint first alleges that Ed.R. was five "at the times relevant to this Complaint," but then later alleges that he was four.  (D.E. 1, Compl. ¶¶ 18, 42.)  The Court presumes for purposes of this opinion that Ed.R. was four at the time of the incident and five at the time the complaint was filed.

Parkway Police Department (the "PIPPD"); PIPPD officers Corey Patullo, Thomas M. Shine, and Jeffrey M. Kimbro (the "defendant officers"); Care Plus NJ, Inc. (a company providing certain services for the PIPPD by contract); and Lisa Saunders, a Care Plus employee. Presently before the Court is the motion to dismiss (D.E. 15) filed by the PIPPD and the defendant officers. For the reasons set forth below, the motion will be granted in part and denied in part.

## II.    Background

The complaint alleges as follows. Panova, Rivkin, and their children live in Fort Lee, New Jersey, near the entrance to the Palisades Interstate Park. (Compl. ¶¶ 2-5, 20.) She and the children routinely hike in and around the park. (*Id.* ¶ 22.) According to the complaint, theirs is an "active family that likes to engage in athletic activities, such as hiking, ice skating, rock climbing, skiing and diving." (*Id.* ¶ 34.)

On April 15, 2020, Panova set out to hike in the park with Ev.R. and Ed.R., accessing it through a portion of fencing outside the park's entrance that had been downed by a log. (*Id.* ¶¶ 18, 23, 26, 29, 42.) Panova had "seen the condition of the downed fence for quite some time, and had observed other individuals using it to access the hill into the park for hiking." (*Id.* ¶ 24.) She had also seen people entering the area and carrying bikes up that hill. (*Id.* ¶ 25.) There was no signage indicating that the fence area could not be used as a park entrance. (*Id.* ¶ 28.)

Once inside the park, Panova and her children "used the accessible part of the hill to access a commonly known hiking trail." (*Id.* ¶ 27.) They began walking up the hill "without incident." (*Id.* ¶ 29.) When they reached the top of the hill, defendant Craddock walked by with a woman companion. (*Id.* ¶ 30.) He started shouting at Panova "without provocation," alarming her. (*Id.* ¶¶ 31-32.) She attempted to ignore him, but he approached and asked if she needed help. (*Id.* ¶¶ 33, 35.) Coming closer, he insisted she did. (*Id.* ¶¶ 37-38.) When Panova told him they were fine, Craddock threatened to call the authorities unless she and the children did what

he told them.  (*Id.* ¶¶ 39-40.)  He grabbed Panova's son around the waist and held him "without consent or authorization," frightening him and distressing Panova.  (*Id.* ¶¶ 42-44.)  Craddock refused to let the boy go despite Panova's pleas.  (*Id.* ¶¶ 45, 47.)  Contrary to New Jersey's mask requirements, Craddock was not wearing a mask and Panova told him she was not comfortable with a stranger touching her child or being in close proximity to him without a mask.  (*Id.* ¶¶ 46, 48-49.)  Craddock continued to restrain the boy while he called the police.  (*Id.* ¶ 50.)

Defendant officers Patullo, Kimbro, and Shine of the PIPPD arrived, entering the park through the same downed fence.  (*Id.* ¶¶ 51-52.)  Panova told the officers she did not want Craddock (who continued to restrain the boy while she talked to the officers) holding Ed.R. and that she wanted to walk back down the hill with her children.  (*Id.* ¶¶ 53, 57.)  Like Craddock, the officers were not wearing masks and they stood close by, notwithstanding masking and social distancing protocols in place.  (*Id.* ¶¶ 54-56.)

The officers "prevented . . . Panova from descending the hill under her own free will and volition," despite "there being no actual or threatened harm" to her and the children because they could have "easily walked back down without any appreciable risk."  (*Id.* ¶¶ 58-60.)  Instead, the officers called for ladders, which responding firefighters carried up the hill.  (*Id.* ¶¶ 61-62.)  They refused to allow Panova to walk down the hill on her own, with Patullo "physically restrain[ing]" her "with force on the cliff."  The officers let Craddock continue to hold Panova's son.  (*Id.* ¶¶ 64-65.)  Panova had been holding her daughter, and only reluctantly handed over the crying child to be carried down the ladder.  (*Id.* ¶ 66.)  Panova alleges that she was then thrown to the ground and dragged.  (*Id.* ¶¶ 67-68.)  Craddock put his hand through her belt loop and Panova was "forcefully carried down the ladder."  (*Id.* ¶ 69.)

3

Rivkin, Panova's husband, had arrived and witnessed some of these events. (*Id.* ¶ 70.) Officers refused to let him help Panova and their children. (*Id.* ¶ 71.) Once Panova and the children were down he hill, the children were released to Rivkin. (*Id.* ¶ 72.)

At that point, in front of her family, Officer Patullo arrested Panova and she was taken to the police station for processing. (*Id.* ¶¶ 73-74.) There, Patullo and Shine "demand[ed] [she] . . . provide her pedigree information," and Patullo made unspecified "intentional, malicious, and condescending statements to [Panova] in the presence of the other officers." (*Id.* ¶¶ 75-76.) They refused her request for water, saying there was none, as well as her repeated requests to use the bathroom because two officers would be required for a bathroom trip and Patullo was busy. (*Id.* ¶¶ 77-82.) Ultimately, several hours later, Shine, unaccompanied by another officer, relocated Panova to a cell that had a bathroom. (*Id.* ¶ 84.) Shine refused Panova's request to talk to her husband or to an attorney. (*Id.* ¶¶ 85-86.)

When Panova refused to speak without an attorney, the officers "needlessly summon[ed] an EMS ambulance" allegedly in retaliation, even though she had not requested any emergency medical treatment. (*Id.* ¶¶ 88-91, 93.) Panova "refus[ed] to accept ambulance treatment." (*Id.* ¶¶ 92, 95.) The officers then called the New Jersey Department of Child Protection and Permanency (the "DCPP") to make a complaint against Panova and Rivkin for child abuse and neglect. (*Id.* ¶ 95.) Patullo also filed a criminal complaint charging Panova with child endangerment under N.J.S.A. 2C:24-4(a)(2) and obstruction of the administration of the law under N.J.S.A. 2C:29-1(a). (*Id.* ¶ 94.)

Additionally, Patullo contacted defendant Care Plus, which has a contract with the PIPPD "to provide screening services to determine whether persons are so mentally unfit they must be involuntarily committed under state law." (*Id.* ¶¶ 96-97.) Defendant Saunders, on behalf of Care

Plus, came to the station to evaluate Panova.  (*Id.* ¶ 98.)  After a half-hour discussion between the two, Saunders told Panova she was fine and further evaluation was unnecessary.  (*Id.* ¶¶ 99-100.)  But, according to Panova, Saunders was "pressured" to change her recommendation to one for involuntary commitment after speaking with the other defendants.  (*Id.* ¶¶ 101-02.)  Saunders authorized Panova's involuntary commitment to Bergen New Bridge Health and Medical Center; Panova was transported there and held for 10 hours.  (*Id.* ¶¶ 103-04.)  The officers did not tell Rivkin where his wife had been taken, though he was at the station with an attorney and was asking where she was.  (*Id.* ¶¶ 105-08.)  At the medical center, no drugs or alcohol were detected in Panova's system, and she was released without any diagnosis of prior or present mental health conditions.  (*Id.* ¶¶ 111-12.)

Panova and her criminal defense attorney later returned to the police station to file a citizen complaint against Craddock.  (*Id.* ¶ 113.)  Because the officers "incorrectly believed Plaintiffs were filing an internal affairs complaint," Panova was "threatened and intimidated by comments from the officer taking the report that she would be arrested and put in prison."  (*Id.* ¶¶ 114-15.)  Alternatively, she alleges, Craddock was a former firefighter and had a "prior relationship" with law enforcement members in Bergen County who sought to protect him from a complaint.  (*Id.* ¶ 116.)

With respect to the officers' DCPP report, investigators from that agency arrived at Panova's home within two hours of her release from Bergen New Bridge.  (*Id.* ¶ 118.)  The DCPP case worker also went to the location in the Palisades Interstate Park where Panova was arrested.  (*Id.* ¶ 119.)  The DCPP dismissed the complaint against Panova and Rivkin as "not established."  (*Id.* ¶ 120.)  The couple was subjected to "subsequent anonymous reports of child abuse and neglect made to the [DCPP] that were investigated," none of which were established

or founded.  (*Id.* ¶¶ 122, 124.)  Plaintiffs assert that the anonymous complaints were "made, instigated, or done in conspiracy with [d]efendants."  (*Id.* ¶ 123.)  With respect to the criminal charges against Panova, the Bergen County Prosecutor's Office dismissed or downgraded them.[2]  (*Id.* ¶ 126.)

Plaintiffs sent a timely notice of tort claim and ultimately filed the instant federal action on January 6, 2021.  The complaint asserts claims, against all defendants, for false arrest (count 1); malicious prosecution (count 2); abuse of process (count 3); First Amendment retaliation (count 4); due process violations (count 5); denial of equal protection (count 6); municipal liability (count 7); supervisory liability (count 8); excessive force (count 9); battery (count 10); negligence (count 11); negligent hiring, training, and supervision (count 12); a count entitled "*respondeat superior* for state law claims against public entity defendants" (count 13); conspiracy (count 14); aiding and abetting (count 15); a claim under the New Jersey Civil Rights Act that appears to invoke rights under the New Jersey constitution (count 16); and loss of consortium (count 17).

Care One and Saunders filed an answer, together with a crossclaim for contribution and indemnification.  (D.E. 3.)  Craddock was served with the complaint on May 25, 2022, but has yet to answer or otherwise respond to it.  (D.E. 37.)  The PIPPD and the defendant officers (collectively, the "moving defendants") have moved pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss the complaint in its entirety against them and raise seven discrete arguments in support.  (D.E. 15.)  Plaintiffs oppose (D.E. 20), and the moving defendants have filed a reply (D.E. 21.)

---

[2] Depositions in the within case have been stayed pending resolution of the remaining criminal charges.  (D.E. 36.)

### III.     Standard of Review

The moving defendants' motion attacks the complaint on both jurisdictional and non-jurisdictional grounds under Rules 12(b)(1) and 12(b)(6).

When deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court must first determine whether the movant presents a "facial" or "factual" attack to jurisdiction.  "A facial attack contests the sufficiency of the complaint because of a defect on its face, whereas a factual attack asserts that the factual underpinnings of the basis for jurisdiction fails to comport with the jurisdictional prerequisites." *Halabi v. Fed. Nat'l Mortg. Ass'n*, 2018 WL 706483, at *2 (D.N.J. Feb. 5, 2018) (Vazquez, J.) (internal citations and quotations omitted).  Regardless of whether a challenge is facial or factual, however, "the Plaintiff has the burden to prove that the Court has jurisdiction." *Bd. of Trustees of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Caliber Auto Transfer, Inc.*, 2010 WL 2521091, at *8 (D.N.J. June 11, 2010) (Debevoise, J.).  Here, the moving defendants appear to have lodged a factual attack, arguing that the PIPPD is not subject to this Court's jurisdiction because it is an arm of the state.  In this regard, the Court need not "presume the truthfulness of plaintiff's allegations," and may instead "evaluat[e] for itself the merits of [the] jurisdictional claims." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (alterations in original) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept as true all allegations in the complaint, as well as all reasonable inferences that can be drawn therefrom. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The factual allegations in the complaint must be viewed in the light most favorable to the plaintiff. *See Phillips v. County of Alleghany*, 515 F.3d 224, 231 (3d Cir. 2008).  To survive a motion to dismiss, a plaintiff must "plead more than the possibility of

7

relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  The Court will

"disregard legal conclusions and 'recitals of the elements of a cause of action, supported by mere

conclusory statements.'" *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010)

(quoting *Iqbal*, 556 U.S. at 678).

## IV.    Discussion

The moving defendants argue that this matter is subject to dismissal pursuant to the

abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37 (1971) in light of the criminal

charges pending against Panova in state court.  (D.E. 15-1, Mov. Br. at 40; D.E. 21, Reply Br. at

6.)  They further contend that even if *Younger* abstention is inapplicable, the complaint should be

dismissed against them in its entirety.  (Mov. Br. at 8-39; Reply Br. at 2-5.)

### A.   *Younger* **Abstention Doctrine**

Under the *Younger* abstention doctrine, a district court "has discretion to abstain from

exercising jurisdiction over a particular claim where resolution of that claim in federal court

would offend principles of comity by interfering with an ongoing state proceeding." *Zahl v.

Warhaftig*, 655 F. App'x 66, 70 (3d Cir. 2016) (internal citations and quotations omitted).

According to the three-prong test established in this Circuit, *Younger* abstention is appropriate if:

"(1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings

implicate important state interests; and (3) the state proceedings afford an adequate opportunity

to raise federal claims." *Lui v. Comm'n, Adult Ent., De*, 369 F.3d 319, 326 (3d Cir. 2004).

The moving defendants argue, without analyzing any of the factors, that *Younger*

abstention is appropriate here because "some underlying criminal charges may still be pending

against Panova." (Mov. Br. at 40.)  While the complaint does refer to state criminal proceedings

that remain pending (*see* Compl. ¶ 126; *see also* D.E. 35, 36), the moving defendants have not

provided any meaningful information about them, or demonstrated that ongoing state

proceedings "implicate important state interests" or afford plaintiffs "an adequate opportunity to raise federal claims." *Jaffery v. Atl. Cty. Prosecutor's Off.*, 695 F. App'x 38, 40 (3d Cir. 2017) (quoting *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989)).  As such, dismissal on those grounds is denied.

### B.  Claims Against the PIPPD

The Court next turns to the moving defendants' arguments attacking the substance of plaintiffs' claims, beginning with the claims specific to the PIPPD.

The moving defendants argue that the PIPPD is entitled to sovereign immunity because it is considered an arm of the state and is not a "person" subject to suit under Section 1983.  The Eleventh Amendment incorporates a general principle of sovereign immunity that bars citizens from suing any state in federal court for money damages.  *See* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.").  The Supreme Court has held that immunity from suit extends not just to states, but also to entities that are considered arms of the state.  *See Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  An entity is considered an arm of the state "when a judgment against it 'would have essentially the same practical consequences as a judgment against the State itself.'"  *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 545-46 (3d Cir. 2007), *amended on reh'g* (Mar. 8, 2007) (quoting *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989)).

Section 1983 provides a cause of action against a person who, while acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within this jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws." 42 U.S.C. § 1983. Because only "persons" are subject to suit under Section 1983, entities that are considered "arms of the state" cannot be sued for Section 1983 violations. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66-70 (1989).[3]

The Third Circuit considers three factors, known as the *Fitchik* factors, when analyzing whether an entity is an arm of the state for Eleventh Amendment purposes: "(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has." *Bowers*, 475 F.3d at 546 (citing *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006)). No one factor is dispositive. *See Cooper v. Se. PA Transp. Auth.*, 548 F.3d 296, 302 (3d Cir. 2008). Rather, each case is to "be considered on its own terms, with courts determining and then weighing the qualitative strength of each individual factor in the unique factual circumstances at issue." *Karns v. Shanahan*, 879 F.3d 504, 514 (3d Cir. 2018).

The moving defendants argue that application of the *Fitchik* factors "makes clear" that the PIPPD—as a subsidiary of the Palisades Interstate Park Commission (the "PIPC")—is an arm of the state, which plaintiffs do not directly dispute. (Mov. Br. at 9.) Instead, they claim that the PIPPD waived its sovereign immunity defense because the PIPC's charter includes a "to sue or be sued" clause.[4] (D.E 20, Opp. Br. at 11-14.) Because a finding of waiver would obviate an analysis of the *Fitchik* factors, the Court will begin with plaintiffs' waiver argument.

---

[3] The same standard applies under the New Jersey Civil Rights Act. *See Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 856 (3d Cir. 2014).

[4] *See* N.J.S.A. 32:17-4 (establishing the PIPC as a "joint corporate municipal instrumentality" of the states of New Jersey and New York, and providing that it "shall have power to sue and be sued").

### a. Waiver

Plaintiffs primarily rely on the New Jersey Supreme Court's opinion in *Interstate Wrecking Co. v. Palisades Interstate Park Com.*, 57 N.J. 342 (1971).  There, a private contractor brought a breach of contract action against the PIPC in New Jersey state court arising from a contract performed in New York.  The PIPC moved to dismiss the complaint, arguing that "the courts of New Jersey had no jurisdiction over the subject matter of the action or the person of the defendant."  *Id.* at 345.  The law division found that the "to sue or be sued" clause in the PIPC's charter "amount[ed] to a consent by New York that the [PIPC] could be sued in [New Jersey] courts" and denied the PIPC's motion to dismiss, which was upheld by the appellate division. *Id.* at 345-46.  The Supreme Court agreed, holding that "when the New Jersey Legislature approved the sue and be sued clause in the compact it meant to waive sovereign immunity and to authorize suits against the [PIPC] generally."  *Id.* at 346.

The issue in *Interstate Wrecking Co.* was whether *the state of New York* had waived its sovereign immunity to be sued in *New Jersey state court* by virtue of the "to sue or be sued" clause in the PIPC's charter, and the Supreme Court found that it had.  Here, plaintiffs argue that the "to sue or be sued" clause must also be construed as waiving *the state of New Jersey's* Eleventh Amendment immunity from suit in *New Jersey federal court*.  But the Court sees no viable basis to make that inferential leap.  While only three federal cases have cited *Interstate Wrecking*, one of them squarely addressed its applicability under factually-analogous circumstances.  In *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35 (2d Cir. 1977), the plaintiffs brought a civil rights action against the PIPC in New York federal court, alleging that two park policemen employed by the state of New York violated their constitutional rights when they ordered the plaintiffs out of their vehicle at gunpoint and conducted a warrantless search.

11

The PIPC moved to dismiss the complaint on sovereign immunity grounds, which the district court denied. The Second Circuit reversed on appeal, finding that the PIPC was immune from suit under the Eleventh Amendment despite the "to sue or be sued" clause in its charter.[5] Distinguishing *Interstate Wrecking*, the court reasoned that it "d[id] not construe the sue-and-be-sued clause *to extend the consent of the states to be sued in the state courts, to a waiver of the states' Eleventh Amendment immunity in the federal courts*." *Id.* at 40 (emphasis added).

The Court agrees with the reasoning in *Trotman* and finds immunity is not waived here, and further that plaintiffs have supplied no other basis to support a finding of waiver.[6] Accordingly, it will proceed to analyze the *Fitchik* factors, recognizing that the burden of proving their applicability lies with the moving defendants. *See Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

### b. *Fitchik* Factors

#### i. Funding

The first factor analyzes whether the state of New Jersey would pay for a judgment entered against the PIPPD. As plaintiffs appear to concede (*see* Opp. Br. at 10-14), the PIPPD is a subdivision of the PIPC. *See* N.J.S.A. 32:14-4.1 to -21. The moving defendants argue that

---

[5] The Second Circuit also recognized the liability provision in the PIPC's charter, which provides that neither the state of New Jersey or New York "shall be liable for any torts of the [PIPC] . . . , except as provided by the laws of such state." N.J.S.A. 32:17-9.

[6] Plaintiffs' reliance on *Bell v. Bell*, 83 N.J. 417 (1980) is also unavailing. There, the New Jersey Supreme Court addressed whether the Delaware River Port Authority qualified as a "public entity" under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, *et seq.,* in connection with a *state court* personal injury lawsuit—not a civil rights lawsuit in *federal court*. Indeed, the Tort Claims Act has "repeatedly been held to authorize suit *only* in state court." *NJSR Surgical Ctr., L.L.C. v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, 979 F. Supp. 2d 513, 519 (D.N.J. 2013) (McNulty, J.). Accordingly, the Tort Claims Act cannot serve as a waiver to the PIPPD's sovereign immunity.

N.J.S.A. 32:14 contains a number of provisions which demonstrate that the state of New Jersey would "ultimately have to withdraw funds from its treasury for any liability on the part of PIPPD." (Mov. Br. at 11.) For example, N.J.S.A. 32:14-1.4(a) provides that the PIPC is to submit an "annual budget request" to the governor and state legislature as part of the annual budget request by the New Jersey Department of Environmental Protection ("NJDEP"). Additionally, pursuant to N.J.S.A. 32:14-29, the PIPC has the authority to "spend such sum or sums as may be included in the annual appropriation bill for necessary expenses of the [PIPC], and for carrying out the provisions of this chapter," so long as they are first approved by the governor and comptroller.

These provisions, though indicative of the PIPC's budget allotment and authority to spend state funds under certain circumstances, do not clearly demonstrate that the state of New Jersey is obligated to pay a judgment entered against the PIPPD. *See Bowers*, 475 F.3d at 547 ("The appropriate question to ask . . . is whether the State is *obligated* to pay or reimburse the [defendant] for its debts."). Accordingly, the first *Fitchik* factor tilts the scale slightly against immunity.

### ii. State Law Status

The second *Fitchik* factor analyzes the agency's status under state law, including "how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation." *Fitchik*, 873 F.2d at 659.

The PIPC is a creature of interstate compact between the states of New Jersey and New York, *see* N.J.S.A. 32:14-1.3, and the relevant statutory scheme clearly demonstrates that New Jersey treats the PIPPD (as a subdivision of the PIPC) as an instrumentality of the state. The

PIPC's charter provides that the entity is a "joint corporate *municipal instrumentality of the state of New York and the state of New Jersey*," and shall be "deemed to be *performing governmental functions of the two states*."  N.J.S.A. 32:17-4 (emphases added).  In that capacity, the New Jersey state board[7] conferred certain "functions, jurisdiction, rights, powers and duties" onto it, as well as all "legal and equitable title to or in" the property under its control.  N.J.S.A. 32:17-5, 6.  Furthermore, as the moving defendants point out, the PIPC exists within the NJDEP and is entitled to certain benefits provided to it, including the provision of legal services from the state Attorney General.  *See* N.J.S.A. 32:14-1.3, 1.6.  The PIPC is also required to submit an annual report to the government and legislature setting forth "a complete operating and financial statement" of its activities for the preceding calendar year.  N.J.S.A. 32:14-1.11.  PIPC employees who are paid using funds appropriated by the state are considered state employees for workers' compensation purposes and are qualified for membership in the state's retirement program.  N.J.S.A. 32:14-4.  And the PIPC is included in the New Jersey Tort Claims Act's definition of the term "State" with respect to its employees, property, and activities within the state of New Jersey.  *See* N.J.S.A. 59:1-3.

Although, as explained *supra*, the PIPC's charter includes a "to sue or be sued clause," *see* N.J.S.A. 32:17-4, the second *Fitchik* factor leans in favor of immunity.

### iii.  Autonomy

The third *Fitchik* factor focuses on "the degree of independence from state control an entity exercises."  *Bowers*, 475 F.3d at 548.  While the PIPC has some degree of autonomy as a

---

[7] The "New Jersey state board" is defined as "the park or parks in the state of New Jersey now under the jurisdiction, management or control of commissioners of the Palisades Interstate [P]ark, a body politic created pursuant to" state law.  N.J.S.A. 32:17-3.

"separate agency charged with the responsibility of maintaining this interstate park," N.J.S.A. 32:14-1.1, the relevant statutory scheme shows that it is tightly constrained by state authority.

As a general matter, the state board is empowered to confer "functions, jurisdiction, rights, powers and duties" on the PIPC, and the state may "withdraw, modify, alter or amend" them within its territorial limits.  N.J.S.A. 32:17-6.  The PIPC is comprised of ten members, five from New Jersey and five from New York, who are "appointed by the governor of the state of which his predecessor was a citizen."  N.J.S.A. 32:17-4.  Each member must take an oath of office, which is to "be filed in the office of the secretary of state of such state."  *Id.*  In the event of a premature vacancy, the governor is empowered to appoint a new member "with the approval of the senate of such state."  *Id.*; *see also* N.J.S.A. 32:17-11.  The governor may also remove members, after giving them notice of the charges against them and an opportunity to be heard, if they are negligent or engage in other misconduct.  N.J.S.A. 32:17-4.

The moving defendants have also drawn the Court's attention to several provisions relating to funding which weigh against PIPPD's independence.  As it relates to gifts and bequests, while the PIPC is entitled to use them in its "discretion in either state for any park purpose," as well as to "retain and use all revenue and income arising solely from [them]," the state legislature is empowered to "prescribe other terms and conditions upon which or purposes for which [they] may be accepted for use in such state or used in such state or prescribe a different manner of administering [them] and the disposition of all revenues or income arising therefrom."  N.J.S.A. 32:17-7(1).  To that end, the state may require the PIPC to provide it with "reports" and "estimates of revenue and expenditures."  N.J.S.A. 32:17-7(2).  As it relates to spending, the PIPC is required to submit an "annual budget request" to the governor and state legislature as part of the NJDEP's annual budget request.  N.J.S.A. 32:14-1.4(a).  And while the

PIPC has the authority to "spend such sum or sums as may be included in the annual appropriation bill for necessary expenses of the [PIPC], and for carrying out the provisions of this chapter," they must first be approved by the governor and comptroller. N.J.S.A. 32:14-29. Furthermore, the PIPC is not permitted to "pledge the credit of either state except by and with the authority" of the state legislature. N.J.S.A. 32:17-8.

Accordingly, the final *Fitchik* factor leans in favor of sovereign immunity.

* * *

Because the factors, on balance, weigh in favor of sovereign immunity, the Court finds that the PIPPD is an "arm of the state" entitled to Eleventh Amendment immunity, and is not a "person" subject to suit under 42 U.S.C. § 1983.[8]  Though few federal courts have addressed the PIPC and/or PIPPD's entitlement to sovereign immunity, the courts that have tackled the issue have reached the same conclusion. *See Saint-Jean v. Cty. of Bergen*, 509 F. Supp. 3d 87, 99, 114 (D.N.J. 2020) (McNulty, J.) (dismissing § 1983 and pendant state law claims against the PIPC and PIPPD on sovereign immunity grounds, adding that because the New Jersey Tort Claims Act allows suits against public entities and their employees in *state court* but does not operate as an Eleventh Amendment waiver, "the plaintiff's choice of a federal forum may have been ill-advised"); *Trotman*, 557 F.2d at 38 (Eleventh Amendment immunity applied to the PIPC

---

[8] In light of this finding, the Court need not reach plaintiffs' barebones argument that the PIPPD is subject to suit as a municipality of the state of New Jersey. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 (1978) ("Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.").  The Court notes for completeness, however, that with the exception of pointing to one line in the PIPC's charter indicating that it is to be a "joint corporate municipal instrumentality of both the state of New York and the state of New Jersey," *see* N.J.S.A. 32:17-4, plaintiffs have offered no authority to support their position.

because, "in reality," suit against it was "one against the State of New York").   Accordingly, the federal and state law claims asserted against the PIPPD are dismissed with prejudice.

### C.  Claims Against the Defendant Officers

#### a.  False Arrest and Malicious Prosecution Claims (Counts 1 and 2)

The Court turns to plaintiffs' claims against the defendant officers in their individual capacities, which are not barred by the Eleventh Amendment.  *See Hafer v. Melo*, 502 U.S. 21, 20-21 (1991); *Kirkland v. DiLeo*, 581 F. App'x 111, 116 n. 11 (3d Cir. 2014).

The moving defendants first argue that plaintiffs' false arrest (count 1) and malicious prosecution (count 2) claims must be dismissed because the defendant officers "had probable cause to arrest and prosecute her for endangering the welfare of a child and obstructing the administration of law."  (Mov. Br. at 19.)  As the moving defendants point out, "[b]oth claims for false arrest and claims for malicious prosecution require a showing of a lack of probable cause." *Born v. Aberdeen Police Dep't*, 2009 WL 2905433, at *2 (D.N.J. Sept. 8, 2009) (Thompson, J.), *aff'd sub nom. Born v. Aberdeen Police Dep't*, 397 F. App'x 801 (3d Cir. 2010); *see Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (§ 1983 false arrest claim requires inquiry into whether "arresting officers had probable cause to believe the person arrested had committed the offense" (*quoting Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988)); *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (§ 1983 malicious prosecution claim requires plaintiff to demonstrate, among other things, that the defendant initiated a criminal proceeding "without probable cause").  The issue of "probable cause in civil claims for false arrest and malicious prosecution is generally a question of fact."  *Campanello v. Port Auth. of New York & New Jersey*, 590 F. Supp. 2d 694, 702 (D.N.J. 2008) (Greenaway, J.) (citing *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998)).

Probable cause does not "demand[] proof of guilt beyond a reasonable doubt." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016). Instead, it exists if there is a "fair probability that the person committed the crime at issue." *Id.* (quoting *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000)). That is, there is probable cause to arrest "'when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested.'" *Id.* (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)). In the malicious prosecution context, probable cause "means reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious [person] in the belief that the accused is guilty of the offense with which he is charged." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (quoting *Lind v. Schmid*, 67 N.J. 255, 263 (1975)).

Here, the complaint alleges that Panova and her children entered the park through a downed fence and climbed a hill to access a commonly-known hiking trail. (*Id.* ¶¶ 23, 26-27, 29.) They did so "without incident" and could have "walked back down [the hill] without any appreciable risk." (*Id.* ¶¶ 29, 59.) There was no signage indicating that the downed fence could not be used, and Panova had "observed other individuals using" it. (*Id.* ¶¶ 24, 28.) When the defendant officers responded to the scene, Panova was already upset because Craddock, a stranger who was unmasked, was holding her four-year-old son "without consent or authorization" and would not release him. (*Id.* ¶¶ 42-43, 46-49.) The defendant officers, who were also unmasked, refused to allow Panova and her children to walk back down the hill and rejected the assistance of the children's father. (*Id.* ¶¶ 55, 63, 71.) Instead, they "physically restrain[ed]" her "with force on the cliff," and allowed Craddock to "forcefully carr[y] [her]

down the ladder" they had called to the scene.  (*Id.* ¶¶ 65, 69.)  These facts, if true, create a factual issue as to whether probable cause existed for Panova's arrest or the subsequent charges against her of child endangerment and obstruction of the law. While the moving defendants justify their actions because Panova was "the only person at the scene who appears to have not considered the situation an emergency" (*see* Mov. Br. at 32), this does not resolve the basic issue of whether an emergency existed, which, of course, awaits discovery and possibly the determination of the factfinder.  *See Campanello*, 590 F. Supp. 2d at 703-04 (denying motion to dismiss false arrest and malicious prosecution claims because, at the "early juncture" of the case, the parties had conducted "little discovery" as to probable cause at the time of arrest). Accordingly, the false arrest and malicious prosecution allegations are sufficient to withstand the instant motion.

### b.  Excessive Force (Count 9)

The moving defendants next argue that plaintiffs' excessive force (count 9) claim must be dismissed.  The issue of whether officers used "excessive force in the course of an arrest is properly analyzed under the Fourth Amendment."  *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999).  To state a claim for excessive force under the Fourth Amendment, "a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Noble v. City of Camden*, 112 F. Supp. 3d 208, 227 (D.N.J. 2015) (Simandle, J.) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989).  Force is considered excessive when "it is objectively unreasonable based on the totality of the circumstances." *White v. City of Vineland*, 500 F. Supp. 3d 295, 303 (D.N.J. 2020) (Wolfson, J.) (citing *Groman v. Twp. Of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995)).  When analyzing whether force is excessive, courts look to a number of factors, including:

> the facts and circumstances of each particular case; the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or

others; whether he is actively resisting arrest or attempting to evade arrest by flight; the duration of the action; whether the action takes place in the context of effecting an arrest; the possibility that the suspect might be armed; and the number of persons with whom an officer must contend at one time.

*Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

Here, the complaint alleges that when the defendant officers arrived at the scene, there were at least three adults present—Craddock, the woman he was with, and Panova—as well as Panova's two children.  The complaint does not allege that Panova was attempting to flee; to the contrary, Panova remained at the scene because Craddock was holding her son "without consent or authorization."  (*Id.* ¶¶ 45, 47-50.)  Nor is there any allegation that Panova was armed or could have been armed.  Against that backdrop, reasonable jurors could find for Panova on her allegations that the officers' use of force—which included "physically restrain[ing]" Panova "with force on the cliff" and then "throw[ing] [her] to the ground" and dragging her "for some distance down the cliff" (*id.* ¶¶ 65, 67-68)—was excessive.  Accordingly, the complaint plausibly alleges an excessive force claim against the officers, and the motion to dismiss plaintiffs' excessive force claim must be denied.

### c.  Abuse of Process, First Amendment Retaliation, Due Process, Equal Protection, and Conspiracy Claims (Counts 3, 4, 5, 6, and 14)

The moving defendants next argue that plaintiffs' abuse of process (count 3), first amendment retaliation (count 4), due process (count 5), equal protection (count 6), and conspiracy (count 14) causes of action must be dismissed for failure to state a claim under Rule 12(b)(6).  The Court will address each cause of action in turn, mindful of the fact that plaintiffs have failed to offer specific arguments regarding the viability of their abuse of process, equal protection, and conspiracy causes of action.  (*See generally* Opp. Br. at 16-17.)

### i. Abuse of Process (Count 3)

A cause of action for abuse of process requires the plaintiff to demonstrate the defendant's "(1) ulterior motive; and (2) 'further act after the issuance of process representing the perversion of the legitimate use of process.'" *Zebrowski v. Wells Fargo Bank, N.A.*, 657 F. Supp. 2d 511, 517 (D.N.J. 2009) (Rodriguez, J.) (quoting *Tare v. Bank of Am.*, 2009 WL 799236, at *7 (D.N.J. Mar. 24, 2009) (Linares, J.)).  "Unlike a malicious prosecution claim, which concerns the motives for initiating process, an abuse of process claim must arise from conduct that occurred after process was initiated."  *Esposito v. Little Egg Harbor Twp.*, 2012 WL 1495468, at *2 (D.N.J. Apr. 27, 2012) (Wolfson, J.).  In other words, "[a]n abuse of process claim does not turn on whether the process was legitimately or illegitimately initiated, but rather on whether after the initiation, it was used for some improper purpose."  *Nieves v. Ortiz*, 2008 WL 4004940, at *10 (D.N.J. Aug. 20, 2008) (Debevoise, J.).

As a preliminary matter, the moving defendants contend that the abuse of process claim should be dismissed because "[t]he theory behind an abuse of process claim is that the process (here, Panova's arrest and being charged) was <u>lawfully</u> initiated," and plaintiffs' theory is "that Panova's arrest was illegitimate from the start."  (Mov. Br. at 28-29.)  However, claims for abuse of process and malicious prosecution are "not mutually exclusive"; as such, plaintiffs' argument that the defendant officers lacked probable cause to arrest and charge Panova does not automatically foreclose an abuse of process claim.  *Batiz v. Brown*, 2013 WL 1137531, at *3 (D.N.J. Mar. 14, 2013) (Bumb, J.); *see Jennings v. Shuman*, 567 F.2d 1213, 1217 (3d Cir. 1977) (finding that abuse of process and malicious prosecution claims "are not mutually exclusive, and that the presence or absence of probable cause is irrelevant to malicious abuse of process").

Turning to the substance of plaintiffs' abuse of process claim, the Court finds that the allegations, though imperfect, are sufficient to survive a Rule 12(b)(6) motion.  Plaintiffs allege that the defendant officers "committed an abuse of process" after Panova was charged with child endangerment and obstruction, and that they did so by "falsely reporting suspected child abuse" to the DCPP.  (*See* Compl. ¶ 158.)  Specifically, they allege that on the day of the incident, the defendant officers filed a report with the DCPP "in retaliation to . . . Panova's refusal to accept ambulance treatment."  (*Id.* ¶ 95.)  The DCPP investigated the allegations by visiting Panova's home and the Palisades Interstate Park, and ultimately dismissed the complaint as "not established."  (*Id.* ¶¶ 117-21.)  Plaintiffs further allege that despite the "not established" finding, "subsequent anonymous reports of child abuse" were made to the DCPP by or "in conspiracy with" the defendant officers, none of which were deemed established.  (*Id.* ¶¶ 122-25.)  And by alleging that the reports were "false and malicious" and that the defendant officers acted "intentionally, maliciously or in reckless disregard" of Panova's constitutional rights (*see id.* ¶¶ 117, 127), plaintiffs adequately plead an ulterior motive.  *See Phillips v. New Jersey Transit*, 2021 WL 1661087, at *10 (D.N.J. Apr. 28, 2021) (Cecchi, J.) (dismissing abuse of process claim where plaintiff failed to allege "specific instances following [his] arrest that could lead the Court to infer that [defendants] acted with an ulterior motive," such as an allegation that defendants "lied during their testimony" at a state hearing); *Pierre v. Treasury Dep't*, 2018 WL 5801549, at *9 (D.N.J. Nov. 5, 2018) (Linares, J.) (plaintiff failed to allege viable abuse of process claim where he did not "set forth any facts showing that the [defendants] *intentionally* withheld information or elicited evidence that they knew to be false").

Accordingly, plaintiffs' abuse of process cause of action as to the defendant officers survives the instant motion.

### ii. First Amendment Retaliation (Count 4)

To plead a First Amendment retaliation claim, a plaintiff must allege that "(1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link existed between the constitutionally protected conduct and the retaliatory action." *Williams v. City of Allentown*, 804 F. App'x 164, 167 (3d Cir. 2020) (quoting *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)). "[T]he key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)).

Here, the allegations in the complaint fall short of asserting a viable First Amendment retaliation claim against the defendant officers. The complaint alleges that Panova sought to "file a citizen complaint against Defendant Craddock," but that an unnamed officer at the police department "threatened and intimidated" her and commented that "she would be arrested and put in prison." (Compl. ¶ 113, 115.) The complaint further alleges that this act was done "to intimidate and/or retaliate[e] against [p]laintiffs for" exercising their constitutional rights— namely, to "make known their opinions to their representatives and petition the government for redress." (*Id.* ¶ 170.) But Panova has asserted constitutional claims against Craddock in this lawsuit; her speech was not "chilled" and she demands judicial redress, demonstrating that whatever pushback she may have received in and around her decision to file a citizen complaint, it failed to deprive her of her constitutional rights. Further, plaintiffs have failed to allege that the *defendant officers* committed the retaliatory act. *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff

must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution.").  For the above reasons, plaintiffs' First Amendment retaliation claim against the defendant officers cannot survive.[9]

### iii.  Due Process (Count 5)

The Court next turns briefly to plaintiffs' due process claim, which appears to be premised on Panova's alleged denial of the right to counsel during custodial questioning.  In the complaint, plaintiffs allege that defendants "fail[ed] to permit . . . Panova [to] receive her constitutional right to counsel" while she was in custody.  (Compl. ¶ 175; *see id.* ¶¶ 85-86, 88-90.)  However, they do not allege that Panova made any incriminating statements to the defendant officers.  To the contrary, and fatal to this claim, the complaint states that Panova "refused to provide information without the opportunity to consult an attorney," and "exercised her constitutional right to ignore [their] questions."  (*Id.* ¶¶ 88-89.)

It is well settled that there is no "freestanding Fifth Amendment claim for denial of the right to counsel during questioning."  *Stora v. Brady*, 2014 WL 5148723, at *5 (D.N.J. Oct. 14, 2014) (Hillman, J.).  Rather, "[t]he right protected under the Fifth Amendment is the right not to be compelled to be a witness against oneself in a criminal prosecution," and the right to counsel during a custodial interrogation recognized in *Miranda v. Arizona*, 384 U.S. 436 (1966) is "merely a procedural safeguard, and not a substantive right."  *Giuffre v. Bissell*, 31 F.3d 1241,

---

[9] In their opposition brief, plaintiffs argue that they engaged in other constitutionally-protected conduct—*i.e.*, complaining to the defendant officers about Craddock's conduct while at the scene, and later requesting counsel—that resulted in retaliation by the defendant officers.  (Opp. Br. at 23-24.)  But the allegations are not anchored with facts; instead plaintiffs describe arguably intimidating and threatening behavior that the complaint seeks to place in a constitutional bucket.  A First Amendment retaliation claim requires more, particularly when plaintiffs have not missed their chance to seek judicial redress on account of conduct by defendants.

1256 (3d Cir. 1994).  Because there is no allegation in the complaint that the defendant officers elicited incriminating statements from Panova without counsel present, plaintiffs' due process cause of action is dismissed.

### iv.  Equal Protection (Count 6)

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  A *prima facie* equal protection claim under Section 1983 requires a plaintiff to "prove the existence of purposeful discrimination."  *Chambers ex rel. Chambers v. Sch. Dist. Of Philadelphia Bd of Educ.*, 587 F.3d 176, 196 (3d Cir. 2009) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)).  Specifically, a plaintiff must prove that s/he was a "member[] of a protected class," and "received different treatment than that received by other similarly-situated individuals."  *Oliveira v. Twp. of Irvington*, 41 F. App'x 555, 559 (3d Cir. 2002); *see Kuhar v. Greensburg-Salem School Dist.*, 616 F.2d 676, 677 n. 1 (3d Cir. 1980) (plaintiff asserting equal protection cause of action must allege that "he is receiving different treatment from that received by other individuals similarly situated").  Notably, a plaintiff bringing an equal protection claim "must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual."  *Pollock v. City of Ocean City*, 968 F. Supp. 187, 191 (D.N.J. 1997) (Irenas, J.) (internal citations and quotations omitted).

Here, plaintiffs fall far short of asserting a *prima facie* equal protection claim.  They allege that the defendant officers engaged in "the selective enforcement of legal standards" against Panova because she is "a female of Ukrainian descent."  (Compl. ¶ 183.)  However, they have offered no allegation, specific or otherwise, which would allow the Court to infer that the defendant officers acted with discriminatory intent.  For example, plaintiffs have not alleged that

25

the defendant officers treated males or non-Ukrainian individuals more favorably under similar circumstances; nor have they offered any evidence indicative of purposeful discrimination, such as the defendant officers' use of gendered or nationality-based epithets during Panova's arrest and detention. *See Benjamin v. E. Orange Police Dep't*, 937 F. Supp. 2d 582, 596 (D.N.J. 2013) (Martini, J.) (dismissing equal protection claim where complaint "include[d] no allegations whatsoever of purposeful discrimination"); *Bell v. Sandy*, 2013 WL 4067960, at *4 (D.N.J. Aug. 12, 2013) (Rodriguez, J.) (dismissing equal protection cause of action where plaintiff "ma[de] no statement about the treatment of other" similarly-situated individuals). Accordingly, any equal protection claim against the defendant officers must be dismissed.

### v. Conspiracy (Count 14)

Finally, plaintiffs assert a cause of action for conspiracy to deprive Panova of her civil rights, which is cognizable under both 42 U.S.C. § 1985(3) and New Jersey law.  A plaintiff who was injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" may assert a claim under Section 1985(3).  *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006).  To state a cognizable Section 1985(3) claim, "a plaintiff must allege: (1) a conspiracy of two or more persons; (2) motivated by racial or class-based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States."  *Phifer v. Sevenson Env't Servs., Inc.*, 619 F. App'x 153, 155 (3d Cir. 2015).

In New Jersey, "[a] civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal

element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Sunkett v. Misci*, 183 F. Supp. 2d 691, 722 (D.N.J. 2002) (Orlofsky, J.) (quoting *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 364 (App. Div. 1993)).  There can be no claim for civil conspiracy "in the absence of an underlying wrong."  *Id.*

Here, plaintiffs allege that two or more persons deprived Panova of her civil rights, which caused her mental and physical suffering.  (Compl. ¶ 230, 232.)  They also allege—adequately, as the Court determined in Section (IV)(C)(a) *supra*—that the defendant officers falsely arrested and maliciously prosecuted her.  (*Id.* ¶¶ 153, 230.)  Plaintiffs' remaining civil conspiracy allegations, however, miss the mark under both federal and state law.  For example, while plaintiffs allege in a conclusory fashion that the defendant officers entered into an "agreement" to deprive Panova of her civil rights (*see, e.g.*, *id.* ¶ 230), they have failed to assert any facts about that "agreement," or offer information which would otherwise suggest that the defendant officers conspired to deprive her of her civil rights.  *See D'Agostino v. Wilson*, 2019 WL 5168621, at *4 (D.N.J. Oct. 11, 2019) (Kugler, J.) (dismissing conspiracy claim where complaint did not "allege[] facts suggesting that the Secretary of the Air Force conspired with [another] to terminate him"); *see also Beauvil v. City of Asbury Park*, 2018 WL 2455928, at *5 (D.N.J. June 1, 2018) (Thompson, J.) (dismissing civil conspiracy cause of action premised on "conclusory allegations").  Furthermore, if plaintiffs are asserting a Section 1985(3) conspiracy, they have failed to allege that the defendant officers were "motivated by racial or class-based discriminatory animus," as explained in Section IV(C)(c)(iv) *supra*.  *See Phifer*, 619 F. App'x at 155.  In light of these deficiencies, the civil conspiracy cause of action as to the defendant officers must be dismissed.

* * *

Having determined that plaintiffs' First Amendment retaliation (count 4), due process (count 5), equal protection (count 6), and conspiracy (count 14) claims are subject to dismissal as to the defendant officers, the Court must next analyze whether plaintiffs should be given leave to amend their deficiencies. Although plaintiffs have not sought leave to amend in connection with the instant motion, Fed. R. Civ. P. 15(a)(2) provides that leave to amend should be freely given "when justice so requires." Accordingly, "inadequate complaints should be dismissed without granting leave to amend only if the amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 106 (3d Cir. 2002). "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997); *see Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (amendment would be futile "if the amended complaint would fail to state a claim for relief under Rule 12(b)(6)").

Here, the allegations in the complaint arrange themselves into two categories: those stemming from the events that transpired on the hills of the Palisades Interstate Park, and those that occurred after Panova's arrest, mainly at the police station. As explained *supra*, the first set of allegations plead viable claims for excessive force and false arrest, against the defendant officers. However, with the exception of the malicious prosecution and abuse of process claims, allegations about the moving defendants' conduct after Panova was arrested and taken from her family members are not so well defined. To be sure, amid what appears to be some considerable chaos at the police station, plaintiffs have alleged that the defendant officers ignored Panova's requests for water and the toilet, and refused to provide her husband with pertinent information. While unclear, there were apparent efforts to question Panova before she had a lawyer by her side, and the facts about criminal charges and the complaint to the DCPP taken in the best light

28

suggest overreaching.  But these facts are better viewed through the lens of the constitutional claims that survive this motion; they do not support the conclusory contentions that plaintiffs were retaliated against for exercising their First Amendment rights, or were denied due process and equal protection of the law.  And the claim of conspiracy is fatally deficient for the reasons stated above.  The Court has construed plaintiffs' allegations liberally as required, but it cannot allow amendment where the rudimentary elements of a claim are lacking from the complaint.  Accordingly, counts 4, 5, 6, and 14 are dismissed with prejudice.

### d.  Qualified Immunity and Good Faith Immunity Under N.J.S.A. 59:3-3.

Unremarkably, the moving defendants seek dismissal of the claims against the defendant officers on the basis of both federal qualified immunity and good faith immunity under N.J.S.A. 59:3-3 of New Jersey's Tort Claims Act.

Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *accord Thomas v. Tice*, 948 F.3d 133, 141 (3d Cir. 2020).  The doctrine aims to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), and affords "'ample room for mistaken judgments' by shielding 'all but the plainly incompetent or those who knowingly violate the law,'" *Olson v. Ako*, 724 F. App'x 160, 164 (3d Cir. 2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).  "The qualified immunity analysis is a two-step process, which a court may address in either order according to its discretion."  *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 986 (3d Cir. 2014).  The Court decides "whether the facts, taken in the light most favorable to [plaintiffs], establish that the [defendants'] conduct 'violated a constitutional right.'"  *Id.*

(quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).  It also determines "whether that right was 'clearly established' at the time of the challenged conduct."  *Id.*  "'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Thomas*, 948 F.3d at 141 (quoting *Reichle*, 566 U.S. at 664).

Similarly, New Jersey's Tort Claims Act, which governs tort claims against public employees, shields them from liability if they "act[] in good faith in the execution or enforcement of any law."[10]  N.J.S.A. 59:3-3.  *See Rosario v. City of Union City Police Dep't*, 131 F. App'x 785, 789 (3d Cir. 2005) ("Generally, public officials engaged in enforcing the law will be immunized for negligent actions undertaken in good faith.").  For good faith immunity under N.J.S.A. 59:3-3, "a public employee 'must establish that his or her acts were objectively reasonable or that he or she performed them with subjective good faith.'"  *Mills v. Nelson*, 2021 WL 3421712, at *5 (D.N.J. Aug. 5, 2021) (Bartle, J.) (quoting *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 582 (2009)).  Notably, "[t]he same 'objective reasonableness' standard that is used to determine whether a defendant enjoys qualified immunity from actions pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. 59:3-3."  *Brown v. Haddon Twp.*, 2021 WL 2821199, at *8 (D.N.J. July 7, 2021) (Hillman, J.).  The subjective component, on the other hand, requires an analysis of whether the public employee's intentions were "permissible."  *Mills*, 2021 WL 3421712, at *6.

The Court recognizes that "[w]hile early resolution of qualified immunity issues is desirable, factual issues or factual uncertainty may make an assessment impossible at the complaint stage."  *Saint-Jean*, 509 F. Supp. at 110.  That factual uncertainty is at the forefront

---

[10] However, N.J.S.A. 59:3-3 does not "exonerate[] a public employee from liability for false arrest or false imprisonment."

here.  Indeed, the moving brief on this motion raises arguments about whether what plaintiff alleged occurred actually happened at all—a factual issue if ever there was one. Accordingly, the Court cannot determine at this juncture whether the defendant officers are entitled to qualified or good faith immunity.  *See Harris v. Zyskowski*, 2013 WL 6669186, at *6 (D.N.J. Dec. 18, 2013) (Hillman, J.) (denying motion to dismiss on qualified immunity grounds, where court was "not prepared to hold, as a matter of law, that [defendant's] behavior was reasonable under the circumstances as pled in the Complaint"); *see also Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("[W]hile we have recognized that it is for the court to decide whether an officer's conduct violated a clearly established constitutional right, we have also acknowledged that the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue.").  The motion to dismiss this complaint on the basis of qualified immunity is therefore denied.

## V.    Conclusion

For the reasons set forth above, the motion (D.E. 15) is granted insofar as all counts against the PIPPD are dismissed with prejudice, as are counts 4, 5, 6, and 14 against the defendant officers.[11]  The motion is otherwise denied.

An appropriate order will issue.


Date:  June 28, 2022                                    /s/ Katharine S. Hayden
                                                        Katharine S. Hayden, U.S.D.J.

---

[11] Because the moving defendants have not specifically challenged the remaining counts against the defendant officers, the Court has not addressed them.